IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 09-cv-01665-WYD-BNB

DONTRELL LATTIN; and
KRYSTAL HUERTA,

    Plaintiffs,

v.

INV. ANTHONY ULASZEK; and
INV. TODD REVIOUS,

    Defendants.

## ORDER

This matter comes before me on Defendant's Combined Summary Judgment Motion and Brief [ECF No. 24], filed May 17, 2010. I have also considered Plaintiffs' Response [ECF No. 29], filed June 21, 2010 and Defendants' Reply [ECF No. 30], filed July 8, 2010. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

**I.    BACKGROUND**

This is an action brought by Plaintiffs under 42 U.S.C. §1983, against state Arson Investigators Anthony Ulaszek and Todd Revious for violations of the Plaintiffs' Fourth Amendment rights. The Plaintiffs assert that the Defendants entered and searched their home without consent, probable cause, or a warrant. Defendants assert that the claims raised by Plaintiffs are barred by the doctrine of qualified immunity.

The following facts are undisputed. On Tuesday, January 22, 2008, a GMC van

was burned by the use of an incendiary device in the parking lot of the apartment complex at 4778 Peoria Street in Denver, Colorado.  Denver Fire and Police Departments responded to the fire, and the Defendants were assigned to investigate the cause and origin of the fire.  The burned vehicle belonged to Jessica Ferrell, who lived in the same apartment building as the Plaintiffs at the time of the fire.  Ms. Ferrell, the van owner, told the Defendants that she believed Plaintiff Lattin started the fire because Ms. Ferrell had called Child Services to complain about alleged mistreatment of the Plaintiffs' child.

Following this lead, the Defendants went to Plaintiffs' apartment that evening to speak with Mr. Lattin and his wife, Ms. Huerta.  When police officers and the Defendants approached Plaintiffs' apartment, Plaintiffs' dogs began barking.  Mr. Lattin opened the front door and saw a group of police officers standing outside the fence, approximately eight feet from Plaintiffs' front door.  The officers asked Mr. Lattin to step outside the fence, which he did.  After Mr. Lattin stepped outside the fence, officers began questioning him.  They specifically asked if anyone else was in the house.  He replied that his wife was in the house.  The investigators asked if they could talk to her, and he replied that they could.  One police officer and the two Defendants then proceeded to the front door of the Plaintiffs' apartment.  When Mr. Lattin's wife, Ms. Huerta came to the door, the Defendants explained to her that they wanted to speak with her and she agreed.  One of the three law enforcement officers–the police officer or one of the arson investigators–asked Ms. Huerta to first put her dogs away, which she did.  Ms. Huerta closed the doors so the dogs could not run away, then she put the dogs in another part of the house.

After Ms. Huerta put the dogs away, the police officer and the Defendants fully entered the apartment and Defendant Ulaszek began questioning her regarding her husband's whereabouts during the time of the fire. Ms. Huerta never asked the police officer or Defendants to leave her apartment, nor did she indicate that she did not want to speak with them. Ms. Huerta observed items being gathered from the apartment and put into evidence bags. Mr. Lattin was then arrested and transported to a holding cell at the Denver Police District Station, which was across the street from his apartment building. He was charged with arson in the second degree and use of an incendiary device. The criminal charges against Mr. Lattin were eventually dismissed. Plaintiffs then filed this lawsuit against the Defendants. Defendants assert that Plaintiffs' claims should be dismissed because Defendants are entitled to qualified immunity.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Under Federal Rule of Civil Procedure 56(c) summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ross v. The Bd. of Regents of the Univ. of New Mexico*, 599 F.3d 1114, 1116-17 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198

(10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

When reviewing a motion for summary judgment, a court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). In order to rebut a motion for summary judgment, an opposing party must present evidence permitted by Rule 56 setting forth specific facts that would be admissible at trial. Fed. R. Civ. P. 56(e)(2); *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

### B.   Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once a public official asserts a qualified immunity defense, "Plaintiffs must satisfy a heavy two-part burden, showing that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's unlawful conduct." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008). The Supreme Court has held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818 (2009).  Under *Pearson*, "for a plaintiff to prevail, both prongs must be adequately established; however, for a defendant to prevail, inadequacy with respect to either prong will suffice."  *Davis v. City of Aurora,* 705 F.Supp.2d 1243, 1255 (D.Colo. 2010)(citing *Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010)).

The determination under the first prong–whether the defendant violated a constitutional or statutory right–turns on the substantive law regarding that right.  *See e.g., Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007).  The inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey*, 509 F.3d at 1283-84 (internal quotations omitted).  "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits."  *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).

Although I must review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate that the plaintiff has established the heavy two-part burden to overcome Defendants' assertion of qualified immunity.  *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001).

### III. ANALYSIS

I will begin with the first element of the qualified immunity analysis–whether Defendant's entry into the Plaintiffs' home violated the Fourth Amendment.  Defendants

argue they are entitled to summary judgment because Plaintiffs cannot demonstrate that genuine issues of material fact exist as to this issue.  Defendants contend that Plaintiffs consented to the Defendants speaking with Ms. Huerta inside the apartment and that once inside, the materials they seized as evidence, and used to form probable cause to arrest Mr. Lattin, were in plain view.  Plaintiffs respond they did not consent to the Defendants' entry into their apartment, and as such, Defendants' subsequent searches and seizures inside the apartment violated their Fourth Amendment rights.

The Fourth Amendment generally prohibits warrantless entry into a person's home, whether to make an arrest or to search for specific objects.  *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).  "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).  The Fourth Amendment has "drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 573.  It is thus "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (quotations omitted).

In this case, it is undisputed that the Defendants did not have a warrant to arrest either Plaintiff, or to search Plaintiffs' persons or apartment.  The Defendants argue, however, that they obtained valid consent to enter Plaintiffs' apartment.  The presumptive unreasonableness of a warrantless search or seizure inside a dwelling is overcome where "voluntary consent has been obtained, either from the individual whose

property is searched ... or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (internal citations omitted). Defendants contend that they obtained initial consent to enter Plaintiffs' apartment from Mr. Lattin, and further that Ms. Huerta also consented by her words and actions. Plaintiffs respond that even if Mr. Lattin consented to allow the investigators to speak with his wife, he did not consent to such conversation taking place in the house. Plaintiffs argue that entering the house to speak with Ms. Huerta was beyond the scope of Mr. Lattin's consent.

In determining the scope of a defendant's consent, I must ask what a reasonable person would have understood by the exchange between the defendant and police officer. *United States v. Elliott*, 107 F.3d 810, 815 (10th Cir. 1997). Furthermore, a defendant's silence and acquiescence may support a finding of voluntary consent. *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999). A defendant's "failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *Id.* (citing *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir.1 998); *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996); *United States v. McRae*, 81 F.3d 1528, 1538 (10th Cir. 1996); *U.S. v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994)).

Even construing the facts in the light most favorable to Plaintiffs, I find that a reasonable officer in the position of Defendants would have believed that Mr. Lattin consented to Defendants' entry into his apartment. During his deposition, Mr. Lattin testified that when the officers arrived at his apartment, he stepped outside to meet with

them and spoke with them prior to their entering his apartment. He testified as follows:

> Q: So you go to the fence and step outside, is that correct?
> A: Correct.
> Q: And then what happens?
> A: They asked me where I've been. I told them I've been at home. They said, have you been anywhere else? I said, Yes, 7-Eleven, and I pulled out the EBT card and receipt and showed them both that. They gave it back to me, and I put it my pocket.
> *They said, Is anybody else in the house? I said, Yes, my wife. He said, May I go speak to her? And I said, Yes.*
> *So at that time, I moved out of his way. He opened my gate, opened the door, and stuck his head in there, and the dogs barked. Then I heard him tell my wife to put the dogs up. And after that, he walked inside.*

(Lattin Depo. 55:2-18, December 4, 2009, ECF No. 27, Ex. 3).

The investigators did not ask if Ms. Huerta could come outside to join the conversation, but rather whether someone else was *inside* the apartment, and whether they could go speak with her separately. After asking if someone else is *inside*, and then asking to speak with that person, the reasonable implication was that the Defendants would proceed inside. Mr. Lattin's silence and acquiescence in moving out of the way further manifested his consent. And perhaps even more significantly, Mr. Lattin did not object to the investigators entering his apartment. He did not attempt to stop them from entering the apartment or object when they did. The Tenth Circuit has "consistently and repeatedly" held that "a defendant's failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *Gordon,* 173 F.3d at 766.

As such, I find that a reasonable officer in the Defendants' position would understand the exchange between Mr. Lattin and the Defendants to mean that the Defendants had consent to enter the apartment to speak with Ms. Huerta. Plaintiffs'

argument that Defendants exceeded the scope of consent by entering the apartment is of no avail.

Furthermore, Ms. Huerta's actions additionally indicate she also consented to the Defendants' entry into the apartment. Ms. Huerta testified in her deposition that after Mr. Lattin went outside to speak with the officers, the dogs began barking once again. When she walked to her door to see why, she saw someone standing at her door "half in the door, half out" of the door. Specifically, she testified as follows:

> Q: So, now Dontrell's outside. What happens next.
> A: I was just lying there watching TV with our son, and then, all of a sudden, I heard the dogs just going crazy. And then I kept hearing them going crazy, so at first I though maybe Trell was coming back in. But they just kept going crazy, and whenever they see Trell, they stop. But they kept going crazy. So when I walked in there, I seen someone standing there, like half in the door, half out, saying Ma'am, can you please put your dogs away. We need to speak with you. And so I said, Okay. So then I had to –you know, I closed all the doors so they couldn't run anywhere else and I wouldn't have to chase them. And then I went and I grabbed them one by one and put them away.

(Huerta Depo. 96:14 - 97:5, Dec. 4, 2009, ECF No. 27, Ex. 4)

Construing the facts in the light most favorable to Plaintiffs, I will assume that one of the Defendants opened the door to Ms. Huerta's apartment and was standing at the open door when Ms. Huerta walked into the room. Even so, it is undisputed that the law enforcement officer subsequently asked to speak with Ms. Huerta, that she agreed, and that she put the dogs away to facilitate that conversation. She never asked the Defendants to leave her apartment, or indicated that they could not come in. She never indicated that she did not want to speak to them, and she was not touched, handcuffed, or arrested. I conclude that a reasonable person in the position of the Defendants would believe Ms. Huerta, like Mr. Lattin, consented to the entry into her apartment.

Her undisputed actions of putting the dogs away, returning to the door, and then sitting down and speaking with the Defendants all support her voluntary consent. I therefore find that the Defendants' entry into Plaintiffs' apartment was constitutionally permissible given that a reasonable person in the position of the Defendants would believe Mr. Lattin and Ms. Huerta gave voluntary consent.

Once inside the apartment, Defendants argue that the evidence they seized and used to form probable cause to arrest Mr. Lattin was all in plain sight. Although Plaintiffs contend that the items seized by the Plaintiffs were not in plain view from the front door, Plaintiffs do not dispute that the items were not hidden and could be seen once the investigators entered the apartment. (*See* Huerta Depo. 59:13 - 65:10). Based on the items found in plain view that could be used to make an incendiary device–including gas cans, a funnel, scissors, a torn t-shirt, and glass bottles–Defendants formed probable cause to arrest Mr. Lattin. Probable cause requires only a "probability or a substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Mr. Lattin's subsequent arrest and detention was therefore constitutionally permissible.

Because I find it was objectively reasonable for the Defendants to believe that Plaintiffs had consented to entry into Plaintiffs' apartment, and because the items they thereafter seized were in plain sight, I find that there are no genuine issues of material fact precluding summary judgment. The record does not clearly demonstrate that Plaintiffs have established their heavy burden to show that Defendant's violated a constitutional right, and Defendants are therefor entitled to qualified immunity. *Holland*

*ex rel. Overdorff*, 268 F.3d at 1185.

**IV.     CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is **GRANTED** and that the case is **DISMISSED WITH PREJUDICE**.  It is

FURTHER ORDERED that the Trial Preparation Conference set for March 14, 2011 and the Trial set for March 28, 2011 are **VACATED**.

Dated:  February 9, 2011

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge